UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | | |
|---|---|---|
| THOMAS LAURIA, on Behalf of Himself and All Others Similarly Situated, | ) ) | Case No. |
| | ) | |
| Plaintiff, | ) ) | CLASS ACTION |
| | ) | |
| v. | ) ) | CLASS ACTION COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS |
| | ) | |
| BIOSANTE PHARMACEUTICALS, INC., and STEPHEN M. SIMES, | ) ) | |
| | ) | |
| Defendants. | ) ) | |
| | ) ) | |

## INTRODUCTION

1.      This is a securities class action on behalf of all persons who purchased or otherwise acquired the securities of BioSante Pharmaceuticals, Inc. ("BioSante" or the "Company") between February 12, 2010 and December 15, 2011, inclusive (the "Class Period"), against BioSante and its Chief Executive Officer ("CEO"), defendant Stephen M. Simes ("Simes"), for violations of the Securities and Exchange Act of 1934 (the "Exchange Act"). This matter arises out of false and misleading statements about the efficacy of the Company's new experimental compound, LibiGel.

2.      BioSante is a specialty pharmaceutical company focused on developing products for female sexual health and oncology. Over the past decade, BioSante has been in the process of developing LibiGel, a drug designed to improve the sex drive of women suffering from female sexual dysfunction, specifically hypoactive sexual desire disorder ("HSDD").

3.      Defendants (as defined herein) consistently misled investors about the commercial viability, effectiveness, and market potential for LibiGel. Defendants boasted about LibiGel's efficacy over placebo, and provided supposedly concrete "data" regarding the drug's "*statistically significant*" effect on increasing the "number of satisfying sexual events" for women suffering from HSDD. These purportedly positive clinical trial results furthered Defendants' claims of LibiGel being "*the most clinically advanced pharmaceutical product in the U.S.*" Defendants raised investors' expectations by analogizing the female market for LibiGel to the male market for erectile dysfunction, quoting an over $2 billion market, and comparing LibiGel to such blockbuster drugs as "Viagra, Levitra, and Cialis."

4.      As expected, these materially false and misleading statements excited investors and analysts alike. As a result, BioSante's stock traded at artificially inflated prices during the Class Period, reaching a high of $3.81 on July 12, 2011. In turn, analysts responded to the Company's positive efficacy results by reiterating their "Buy" rating and raising their price target.

5. Defendants took advantage of this uninformed yet favorable market, by completing three separate offering during the Class Period for shares of the Company's common stock. In total, these offerings raked in over $85 million in net proceeds for the Company.

6. LibiGel's actual performance and efficacy, however, fell woefully short of Defendants' false statements. On December 14, 2011, BioSante issued a press release disclosing for the first time to investors that LibiGel failed to yield positive results in large-scale efficacy tests designed by the Company. According to the clinical trial results, women treated with LibiGel did not experience a statistically significant increase in either total satisfying sexual encounters or sexual desire. In fact, in the double-blind, placebo-controlled trial, LibiGel did not fare significantly better than the placebo.

7. These surprisingly poor clinical trial results sent BioSante stock careening from a closing price of $2.12 to $0.48 in one day. The Company's shares continued to slide until they hit a low of $0.38 per share. Since the truth emerged, shares of BioSante have lost over 75% of their value.

## JURISDICTION AND VENUE

8. The claims asserted herein arise under section 10(b) and section 20(a) of the Exchange Act, 15 U.S.C. section 78j(b) and section 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. section 240.10b-5.

9. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. section 1331 and section 27 of the Exchange Act, 15 U.S.C. section 78aa.

10. This Court has jurisdiction over each defendant named herein because each defendant is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

11.     Venue is proper in this Court pursuant to 28 U.S.C. section 1391(a) and section 27 of the Exchange Act because: (i) one or more of the Defendants resides in this District; (ii) a substantial portion of the transactions and wrongs complained of herein, including the Defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to BioSante, occurred in this District; and (iii) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect on this District.

## PARTIES

12.     Plaintiff Thomas Lauria purchased securities of BioSante during the Class Period as set forth in the accompanying certification, incorporated by reference herein, and was damaged as a result of Defendants' wrongdoing as alleged in this complaint.

13.     Defendant BioSante is a specialty pharmaceutical company focused on developing products for female sexual health and oncology. One of BioSante's lead products throughout the Class Period included LibiGel, a treatment for female sexual dysfunction, specifically HSDD. BioSante's principal executive offices are located at 111 Barclay Boulevard, Lincolnshire, Illinois.

14.     Defendant Simes is BioSante's Vice Chairman, President, CEO, and director, and has been since 1998. Simes, because of his position with the Company, possessed the power and authority to control the contents of BioSante's quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, i.e., the market. Simes was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of Simes's positions with the Company, and his access to material, non-public information available to him but not to the public, Simes knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public,

and that the positive representations being made were then materially false and misleading. Simes is liable for the false statements pleaded herein.

15.     The defendants named in ¶¶13-14 are sometimes collectively referred to herein as the "Defendants."

## FRAUDULENT SCHEME AND COURSE OF BUSINESS

16.     Defendants are liable for: (i) making material false statements; and (ii) failing to disclose material, adverse facts known to them about BioSante. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of BioSante securities was a success, as it: (i) deceived the investing public as to BioSante's business prospects and operations; (ii) artificially inflated the price of BioSante securities; and (iii) caused plaintiff and other members of the Class (as defined herein) to purchase BioSante securities at inflated prices.

## BACKGROUND

17.     BioSante is a specialty pharmaceutical company focused on developing products for female sexual health, menopause, contraception, and male hypogonadism. Over the past decade, BioSante has been in the process of developing LibiGel, a drug designed to improve the sex drive of women suffering from female sexual dysfunction, specifically HSDD.

18.     HSDD is a persistent lack or absence of sexual desire, fantasies, or thoughts. It is the most common form of female sexual dysfunction. Approximately 43% of women ages 18-59 experience some form of sexual dysfunction. As a result, the anticipated U.S. Food and Drug Administration ("FDA") approval of LibiGel was touted as a huge breakthrough.

19.     LibiGel is a gel formulation of testosterone designed to be quickly absorbed through the skin after application on the upper arm, delivering testosterone to the bloodstream evenly over

time and in a non-invasive and painless manner. Since the beginning of the Class Period, BioSante

had two Phase III clinical trials in progress covered by a Special Protocol Assessment ("SPA")[1] with

the FDA, to demonstrate the safety and efficacy of LibiGel, in the treatment of HSDD. All of the

Defendants' false and misleading statements discussed below involved the efficacy results of LibiGel

in the Phase III clinical trials.

## DEFENDANTS' FRAUDULENT STATEMENTS AND OFFERINGS

20.     Defendants deliberately misled the public concerning the Company's financial

condition and business prospects, specifically relating to the development of the Company's

purportedly breakthrough experimental compound, LibiGel.

21.     On November 12, 2010, BioSante filed its Form 10-Q with the U.S. Securities and

Exchange Commission ("SEC") touting the development of its breakthrough new drug for the

treatment of HSDD. The Form 10-Q misled investors regarding LibiGel's realistic prospects for

FDA approval. The Form 10-Q stated in part:

> *We believe LibiGel remains the lead pharmaceutical product in the U.S. in active development for the treatment of hypoactive sexual desire disorder (HSDD) in menopausal women, and that it has the potential to be the first product approved by the FDA for this common and unmet medical need*, for which presently there is no FDA approved pharmaceutical product. We believe based on agreements with the FDA, including an SPA, that two Phase III safety and efficacy trials and one year of LibiGel exposure in a Phase III cardiovascular and breast cancer safety study with a four-year follow-up post-NDA filing and potentially post-FDA approval and product launch, are the essential requirements for submission and, if successful, approval by the FDA of a new drug application (NDA) for LibiGel for the treatment of FSD, specifically HSDD in menopausal women.

---

[1] SPA is a declaration from the FDA that an uncompleted Phase III trial's design, clinical endpoints, and statistical analyses are acceptable for FDA approval. The clinical protocols for Phase III trials can relate to efficacy claims that will be part of an original new drug application ("NDA"), Biologic License Application ("BLA"), or that will be part of an efficacy supplement to an approved NDA or BLA.

22.     On December 27, 2010, BioSante issued a press release touting the fact that the

Company received additional funding from its institutional investors. These institutional investors

apparently bought into the idea that LibiGel was effective. The press release stated in part:

> "We are pleased to have a commitment from these new and existing institutional
> investors," said Stephen M. Simes, BioSante's president and chief executive officer.
> "This additional funding from these high quality biotechnology institutional investors
> provides us with a strong cash position as we close out the year, ensuring our
> ongoing focus on our LibiGel® Phase III clinical study program. Our objective is to
> submit a new drug application (NDA) to the U.S. Food and Drug Administration
> (FDA) by the end of 2011. LibiGel remains the lead pharmaceutical product in the
> U.S. in active development for the treatment of hypoactive sexual desire disorder
> (HSDD) in menopausal women, and *we continue to believe that LibiGel has the
> potential to be the first product approved by the FDA for this common and unmet
> medical need."*

23.     As expected, these materially false and misleading statements excited more than just

the Company's institutional funders. Hearing about LibiGel's prospects of achieving FDA approval

caused investors to hurriedly purchase BioSante stock. As the market closed on December 27, 2010,

BioSante's stock price immediately soared over 26% on unprecedented trading volume of

10,494,400, over 1,800% greater than the previous trading day's volume.

24.     Defendants took advantage of this uninformed yet favorable market by completing a

direct offering in December 2010 for 10.6 million shares of the Company's common stock and

warrants to purchase 5.3 million additional shares. This offering resulted in $16.9 million in net

proceeds for the Company.

25.     BioSante issued another press release on March 4, 2011, reiterating and repeating its

expectation to be the first Company to have a drug approved by the FDA to treat HSDD. The press

release stated in part:

> "We are pleased to have this commitment from these new and existing institutional
> investors," said Stephen M. Simes, BioSante's president and chief executive officer.
> "This additional funding provides us with added financial power to continue to fund
> our ongoing LibiGel® Phase III clinical study program. We recently announced
> completion of enrollment in the first of the two LibiGel Phase III efficacy trials and

expect to announce completion of enrollment in the second in the near future. LibiGel remains the lead pharmaceutical product in the U.S. in active development for the treatment of hypoactive sexual desire disorder (HSDD) in menopausal women, and *we continue to believe that LibiGel has the potential to be the first product approved by the FDA for this common and unmet medical need."*

26.     On March 16, 2011, BioSante filed its Form 10-K with the SEC announcing the

requirements remaining for submission and approval of LibiGel by the FDA. The Form 10-K stated

in part:

> *We believe LibiGel remains the lead pharmaceutical product in the U.S. in active development for the treatment of hypoactive sexual desire disorder (HSDD) in menopausal women, and that it has the potential to be the first product approved by the FDA for this common and unmet medical need.  We believe based on agreements with the FDA, including an SPA, that two Phase III* safety and *efficacy trials* and a minimum average exposure to LibiGel per subject of 12 months in a Phase III cardiovascular and breast cancer safety study with a four-year follow-up post-NDA filing and potentially post-FDA approval and product launch, are *the essential requirements for submission and, if successful, approval by the FDA of a new drug application (NDA) for LibiGel for the treatment of FSD, specifically HSDD in menopausal women.*  Currently, three LibiGel Phase III studies are underway: two LibiGel Phase III safety and efficacy clinical trials under an FDA agreed SPA and one Phase III cardiovascular and breast cancer safety study.  We have completed enrollment in the first efficacy trial and plan to complete enrollment in the second efficacy trial in the near future. The Phase III safety study is currently enrolling women, and as of the end of February 2011 had enrolled approximately 2,900 women.  In February 2011, we announced that based upon the fifth review of study conduct and unblinded safety data from the safety study by the study's independent data monitoring committee (DMC), the DMC unanimously recommended continuing the safety study as described in the FDA-agreed study protocol, with no modifications.  If enrollment is not completed sooner, enrollment will continue until the safety study reaches its predetermined maximum of 4,000 women.  Upon completion of the statistical analyses of the safety study and efficacy trials, we intend to submit an NDA to the FDA, requesting approval to market LibiGel for the treatment of HSDD in menopausal women. It is our objective to submit the LibiGel NDA to the FDA so that LibiGel may be approved in 2012.*
>
> \*   \*   \*
>
> *We believe LibiGel remains the lead pharmaceutical product in the U.S. in active development for the treatment of HSDD in menopausal women, and that it has the potential to be the first product approved by the FDA for this common and unmet medical need.  We believe based on agreements with the FDA, including an SPA, that two Phase III* safety and *efficacy trials* and a minimum average exposure to LibiGel per subject of 12 months in a Phase III cardiovascular and breast cancer*

safety study with a four-year follow-up post-NDA filing and potentially post-FDA approval and product launch, *are the essential requirements for submission and, if successful, approval by the FDA of an NDA for LibiGel for the treatment of FSD, specifically HSDD in menopausal women.* We have three SPAs in place concerning LibiGel. The first SPA agreement covers the pivotal Phase III safety and efficacy trials of LibiGel in the treatment of FSD for "surgically" menopausal women. The second SPA covers our LibiGel program in the treatment of FSD in "naturally" menopausal women. The third SPA agreement covers the LibiGel stability, or shelf life, studies for the intended commercialization of LibiGel product.

27.    In March 2011, the Company completed another offering of an aggregate of approximately 12.2 million shares of the Company's common stock and warrants to purchase an additional 4 million shares, resulting in net proceeds of $23.9 million.

28.    On April 15, 2011, BioSante presented at the Future Leaders in the Biotech Industry Conference. Defendant Simes, BioSante's president and CEO, spoke at this widely-attended event and provided an update on the LibiGel Phase III clinical development program. Simes touted LibiGel's efficacy over placebo and provided concrete "data" regarding the drug's "statistically significant" effect on increasing the "number of satisfying sexual events." Simes represented the following:

> If you look at our Phase II data, a similar dose by the way. We delivered 300 micrograms a day, which is exactly the dose shown in the past to be effective. *Now in ten published Phase III studies we showed a remarkable 238% increase in the number of satisfying sexual events, which was statically significant significantly better than placebo. We hope to repeat these data in our Phase III studies. Now we've powered the studies to show a difference of one from placebo, one sexual event from placebo, even though in this study we showed a difference of over three satisfying sexual events over placebo.*
>
> Another way to look at the data, and how much we further see this, and you can see in the first month, and this is four week increments is how these are measured, and it's the last four weeks of the study compared to the base line four weeks, number of the events compared to number of events. At baseline our women had about 2.5 satisfying sexual events. And of course I am compelled to say, don't ask me what a 0.5 sexual event is. However *in the first month over four weeks of therapy there was an increase of 100% in the member of satisfying sexual events overly out of this 238% increase over the course of the three months study.*

* * *

We have an independent data monitoring committee that carefully watches the study. And I say, independent of BioSante. Everyone in this study is blinded other than the data monitoring committee. They receive periodically reports of all adverse events of not only the composites of the serious cardiovascular events, but all adverse events and tables that compare LibiGel with placebo and five times now, the last time being in February they told us to continue the course of the study as per protocol.

The next formal meeting is by the end of May. And we hope that even in the interim period that it would continue to report positive outcome. When I say positive outcome, the positive outcome here is that there is no signal or marker about which they are concerned. So that we're showing safety in LibiGel we believe on an going basis.

*In terms of the market for LibiGel, there are good indications. I mentioned several times, there is nothing approved for this indication. However, in 2009 we believe the numbers for 2010 will come in about the same once we get the IMS data. But there were 4 million testosterone prescriptions written off label for women for this indication. And that tell us in primary research that in fact if they were an FDA approved product, they would much prefer to use that in which the vast majority in this case, 96% of their women to the approved product.*

*We believe the market potential is at least $2 billion. Some of you know the magic there is the erectile dysfunction market in the U.S. is a $2 billion market. We think the market for women is bigger than the market for men as evidenced by certain publications that some of you might have seen over the years, with an article in the Journal of the American Medical Association in a younger population of women, 18 to 59, showing that 43% of these women reported experience in sexual dysfunction at one point or another.*

\* \* \*

Today LibiGel is the only product in Phase III clinical development, I might add even Phase II clinical development in treatment of hypoactive sexual desire disorder. *We believe not only we'll be first, but we'll be first and only for quite a long time.* I couldn't tell you today who might be the follow-on player.

29.    BioSante issued a press release on May 31, 2011, supporting its prospects of creating

the first product approved by the FDA for the treatment of HSDD by touting a "90 percent predictive

probability of success" rate.  The press release stated in part:

"LibiGel remains the only product in the world in Phase III clinical development for the treatment of HSDD," said Stephen M. Simes, BioSante's president & CEO. "The ability to stop enrollment as per the sample size analysis that indicates a *90 percent predictive probability of success is very encouraging for the outcome of our LibiGel Phase III clinical development program.* With this most recent

development, *we continue to believe that LibiGel will be the first product approved by the FDA to treat HSDD, also referred to as FSD, in menopausal women."*

30.     As expected, these materially false and misleading statements excited investors, which caused the Company's stock to trade at artificially inflated prices during the Class Period. BioSante stock reached a high of $3.81 on July 12, 2011, an increase of nearly 150% compared to the price of the stock before the defendants disseminated their false and misleading statements.

31.     On August 5, 2011, BioSante filed its Form 10-Q with the SEC representing that *"LibiGel remains the most clinically advanced pharmaceutical product in the U.S."* The Form 10-Q stated in part:

> *We believe LibiGel remains the most clinically advanced pharmaceutical product in the U.S. in active development for the treatment of hypoactive sexual desire disorder in menopausal women, and that it has the potential to be the first product approved by the FDA for this common and unmet medical need.*

32.     In August 2011, the Company completed its third offering of the Class Period for an aggregate of 16 million shares of common stock. Defendants raked in $45.1 million in net proceeds from this underwritten public offering.

33.     BioSante issued a press release on October 4, 2011, announcing the "completion of its two pivotal LibiGel (testosterone gel) efficacy trials." The press release stated in part:

> *BioSante Pharmaceuticals, Inc. (NASDAQ: BPAX) today announced completion of its two pivotal LibiGel (testosterone gel) efficacy trials, required for the company's anticipated LibiGel new drug application (NDA).* The final visit of the last subject enrolled in the second of the two pivotal LibiGel Phase III efficacy trials occurred at the end of September. LibiGel is in development for the treatment of female sexual dysfunction (FSD), specifically, hypoactive sexual desire disorder (HSDD) in menopausal women, for which there is no FDA-approved product.

34.     On October 21, 2011, BioSante hosted a conference call with investors, media representatives, and analysts, during which defendant Simes touted the expansive market for LibiGel. Simes quoted over $2 billion for the market for female sexual dysfunction. Simes further represented the following:

I've chosen to concentrate on LibiGel today because *it is a near-term driver, it's a near-term value producer for our Company* and we have near-term data.

\* \* \*

What's important in our primary research doctors tell us if there were an FDA approved product like LibiGel, product X, they would switch 96% of their currently treated patients from the off-label use to a product like LibiGel. *We think the market potential for female sexual dysfunction in the US is over $2 billion, the magic to $2 billion is that the size of the male erectile dysfunction market.*

And published literature would indicate the market for women is at least as large as the market for men. And you can see some of the numbers, the first one reported in JAMA, a rate of 43% suffering from female sexual dysfunction in the younger age categories and 43% in the older ages, 57 to 85.

35.     On October 25, 2011, BioSante presented at the BioTechnology Industry Organization Investor Forum, during which defendant Simes once again touted the expansive market for LibiGel. Simes analogized the female market for LibiGel to the male market for erectile dysfunction, comparing LibiGel to such blockbuster drugs as "Viagra, Levitra, and Cialis." Simes discussed the widespread off-label use of testosterone by women with symptoms of HSDD and stated that doctors would "switch the vast majority" to LibiGel. Simes portrayed HSDD to be a physiological disease throughout the conference call, and represented the following:

But LibiGel, a most important product in the near-term in Phase III clinical development for the treatment of female sexual dysfunction in menopausal women. *I might add at this time two important pieces of information; there is no pharmaceutical product approved in the United States for this indication; and LibiGel is the only product in Phase III clinical development for this indication anywhere in the world.*

\* \* \*

*In terms in the market, we are very, very excited here. As you can imagine we think it's a big market, but there are some objective data. In 2010, according to IMS and other primary research there are over 4 million testosterone prescriptions written off-label for women for this indication.*

*Doctors tell us in primary research that they will switch the vast majority. In fact the number is over 90% of their off-label used to an FDA approved product. For a couple of simple reasons; they prefer to use an FDA approved product. However,*

*in testosterone a metered dose, we deliver from a metered dose bottle, and the accurate dosing is critical because if you use too little testosterone it's infective. And interestingly if you use too much testosterone because of it's effect on receptor sites, the testosterone is also infective. So, there is a right dose of testosterone. We believe we have identified it and our studies are testing it.*

*We believe then the market for a drug for female sexual dysfunction and the market here is about $2 billion. The magic to the 2 billion is that the size of the erectile dysfunction market in the U.S.: Viagra, Levitra and Cialis.*

*Interestingly from published work, we think that the market for women is at least as bigger as the market for men and probably larger. And publications in JAMA and New England Journal indicate that anywhere from 30 to 50% of women report a sexual functioning issue. Happily, we have an issued patent that covers or will protect LibiGel until mid-2022, and we expect other patent activity even by the end of this year.*

*These are results of primary research, a 101 physicians in this particular survey. And the question was something like how many times per month you get on an unsolicited basis a complaint about sexual function. And it turns out the average position the majority of these are gynecologists, we believe the target market. But the average physician hears about a sexual functioning concern or complaint 37 times per month.*

You can see there is a range obviously from a market point of view, we will be or our licensee will be targeting the high volume prescribers of this type of therapy. So, that we believe from a market point of view it's dramatic. *We believe LibiGel can and will be the number one, the first product to market, because there is no other product in Phase III clinical development.*

36.     On August 5, 2011, BioSante filed its Form 10-Q with the SEC reiterating its statements from three months earlier, representing that *"LibiGel remains the most clinically advanced pharmaceutical product in the U.S."* The Form 10-Q stated in part:

*We believe LibiGel remains the most clinically advanced pharmaceutical product in the U.S. in active development for the treatment of hypoactive sexual desire disorder in menopausal women, and that it has the potential to be the first product approved by the FDA for this common and unmet medical need. We believe based on discussions with the FDA, including an SPA relating to the design of our two LibiGel Phase III safety and efficacy trials, that these trials and ... our Phase III cardiovascular and breast cancer safety study are the essential requirements for submission and, if successful, approval by the FDA of an NDA for LibiGel for the treatment of FSD, specifically HSDD in menopausal women.*

- 12 -

37.     These materially false and misleading statements excited investors and analysts alike, which caused the Company's stock to trade at artificially inflated prices during the Class Period. Analysts responded to the Company's positive efficacy results by continuously reiterating their "Buy" rating and raising their price targets to upwards of $7.00.

38.     The true facts, which were known by the Defendants but concealed from the investing public during the Class Period, were that LibiGel failed to yield superior results to placebo.

39.     As a result of Defendants' false statements, BioSante's stock traded at artificially inflated levels during the Class Period. However, after the above revelations seeped into the market, the Company's shares were hammered by massive sales, sending them down over 91% from their Class Period high.

### THE TRUTH IS REVEALED

40.     On December 14, 2011, BioSante issued a press release disclosing for the first time to investors that LibiGel failed to yield positive results in the Phase III efficacy trials. According to study results, women treated with LibiGel did not experience a statistically significant increase in either total satisfying sexual encounters or sexual desire. In the double-blind, placebo-controlled trial, LibiGel did not fare significantly better than the placebo.

41.     Seeking Alpha, an investment website, published an article the same day the negative results were disclosed, titled, "With Libigel a Failure, Where Will BioSante Bottom Out?" The Seeking Alpha article discussed the reason behind LibiGel's failures and the truth behind Defendants' false and misleading statements. Explaining LibiGel's failure, the article stated, in part:

> We believe that this may have to do with female sexual dysfunction (FSD), and specifically *hypoactive sexual desire disorder* (HSDD) in post-menopausal women that Libigel was targeting for treatment, *being the result of a complex interplay of physical and psychological disorders, arguably with a strong psychological component. In contrast, its male counterpart, erectile dysfunction* (ED), is mostly a

physiological condition that can be treated with chemicals that allow blood to rush to the penis to maintain an erection.

\* \* \*

However, absent a miracle, Libigel at this time, with efficacy and potentially even safety issues related to cardiovascular and increased cancer risks, seems destined for the dust-heap.

42. Analysts responded much like the investors. On December 15, 2011, Jefferies & Co. issued an analyst report entitled, "Downgrade to Hold as LibiGel fails to BLOOM." The report provided in part:

> *BPAX announced top-line LibiGel Ph III data, and in a surprise, missed on all 6 efficacy endpoints. Given the magnitude of the miss, the LibiGel story seems to be done; thus we now remove all LibiGel-related revenue from our model.*

43. The negative clinical trial results came as a big surprise, as there was consensus emerging in the market that the drug had a 70%-80% probability of approval. Defendants caused the market to believe that most of the negatives were safety-related and efficacy was almost a foregone conclusion. In fact, of the eight analysts who covered the stock, five rated it a strong buy and three a buy; no holds, no underperforms, and no sells. And the median price target was $5.88, with high targets ranging between $7 and $8.

44. As news began to leak into the market, on December 14, 2011, BioSante's shares plummeted. Since these facts have emerged, shares of BioSante have lost over 75% of their value. After recently trading as high as $2.52 per share on December 13, 2011, shares of BioSante's common stock closed on December 19, 2011, at just $0.38 per share.

## LOSS CAUSATION

45. During the Class Period, as detailed herein, the Defendants made false and misleading statements and engaged in a scheme to deceive the market. Defendants' course of conduct artificially inflated the price of BioSante securities and operated as a fraud or deceit on Class Period purchasers of BioSante securities by misrepresenting the Company's business and prospects. Later,

when the Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of BioSante securities fell precipitously, as the prior artificial inflation came out of the price over time. As a result of their purchases of BioSante securities during the Class Period, plaintiff and other members of the Class suffered economic loss, i.e., damages, under the federal securities laws.

## FRAUD-ON-THE-MARKET DOCTRINE

46.     At all relevant times, the market for BioSante securities was an efficient market for the following reasons, among others:

(a)     BioSante securities met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)     BioSante filed periodic public reports with the SEC and the NASDAQ; and

(c)     BioSante regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

47.     As a result of the foregoing, the market for BioSante securities promptly digested current information regarding BioSante from all publicly available sources and reflected such information in the prices of the securities. Under these circumstances, all purchasers of BioSante securities during the Class Period suffered similar injury through their purchase of BioSante securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

48.     The statutory safe harbor provided under the Private Securities Litigation Reform Act of 1995 for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. The statements alleged to be false and

misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of

the statements alleged to be false may be characterized as forward looking, they were not identified

as "forward-looking statements" when made and there were no meaningful cautionary statements

identifying important factors that could cause actual results to differ materially from those in the

purportedly forward-looking statements. In the alternative, to the extent that the statutory safe

harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are

liable for those false forward-looking statements because at the time each of those forward-looking

statements was made, the speaker had actual knowledge that the forward-looking statement was

materially false or misleading, and/or the forward-looking statement was authorized or approved by

an executive officer of BioSante who knew that the statement was false when made.

## CLASS ACTION ALLEGATIONS

49.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules

of Civil Procedure on behalf of all persons who purchased or otherwise acquired BioSante securities

during the Class Period (the "Class"). Excluded from the Class are Defendants and their families,

the officers and directors of the Company, at all relevant times, members of their immediate families

and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have

or had a controlling interest.

50.     The members of the Class are so numerous that joinder of all members is

impracticable. The disposition of their claims in a class action will provide substantial benefits to

the parties and the Court. BioSante has over 110 million shares of stock outstanding, owned by

hundreds, if not thousands, of persons.

51.     There is a well-defined community of interest in the questions of law and fact

involved in this case. Questions of law and fact common to the members of the Class which

predominate over questions which may affect individual Class members include:

(a)     whether the Exchange Act was violated by Defendants;

(b)     whether Defendants omitted and/or misrepresented material facts;

(c)     whether Defendants' statements omitted material facts necessary to make the statements, in light of the circumstances under which they were made, not misleading;

(d)     whether Defendants knew or deliberately disregarded that their statements were false and misleading;

(e)     whether the price of BioSante securities was artificially inflated; and

(f)     the extent of damage sustained by Class members and the appropriate measure of damages.

52.     Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from Defendants' wrongful conduct.

53.     Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

54.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

### Against Defendants for Violation of Section 10(b) of the
### Exchange Act and SEC Rule 10b-5

55.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

56.     During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained

misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

57. Defendants violated section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they:

(a) employed devices, schemes, and artifices to defraud;

(b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of BioSante securities during the Class Period.

58. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for BioSante securities. Plaintiff and the Class would not have purchased BioSante securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

## COUNT II

### Against Defendant Simes for Violation of Section 20(a) of the Exchange Act

59. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

60. Defendant Simes acted as a controlling person of BioSante within the meaning of section 20(a) of the Exchange Act. By reason of his position with the Company, Simes had the power and authority to cause BioSante to engage in the wrongful conduct complained of herein. Simes controlled BioSante and all of its employees. By reason of such conduct, Simes is liable pursuant to section 20(a) of the Exchange Act.

61.     As a direct and proximate result of Defendant Simes' wrongful conduct, plaintiff and members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.     Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and certifying plaintiff as a representative of the Class;

B.     Awarding plaintiff and the members of the Class damages, including interest;

C.     Awarding plaintiff reasonable costs, expert fees, and attorneys' fees; and

D.     Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

Date: February 3, 2012

LASKY & RIFKIND, LTD.
LEIGH LASKY
NORMAN RIFKIND
AMELIA S. NEWTON

/s/ Norman Rifkind

351 W. Hubbard Street, Suite 401
Chicago, IL 60654
Telephone: (312) 634-0057
Facsimile: (312) 634-0059
E-mail: lasky@laskyrifkind.com

ROBBINS UMEDA LLP
BRIAN J. ROBBINS
GREGORY DEL GAIZO
LEONID KANDINOV
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail: brobbins@robbinsumeda.com
        gdelgaizo@robbinsumeda.com
        lkandinov@robbinsumeda.com

Attorneys for Plaintiff

692294

## CERTIFICATION OF PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAW

Thomas Lauria ("Plaintiff") declares as to the claims asserted, or to be asserted, under the federal securities laws, that:

     1.    Plaintiff has reviewed the Class Action Complaint and has retained Robbins Umeda LLP as counsel in this action for all purposes.

     2.    Plaintiff did not acquire the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action or any other litigation under the federal securities laws.

     3.    Plaintiff has made the following transaction(s) during the Class Period in the securities that are subject of this action:

| SECURITY | TRANSACTION (Purchase/Sale) | QUANTITY | TRADE DATE | PRICE PER SHARE/SECURITY |
|---|---|---|---|---|
| BPAX | Bot 4/29/2011 | 5000 | | $2.30 |
| BPAX | Bot 8/23/2011 | 2500 | | $2.59 |
| BPAX | Sold 8/23/2011 | 7500 | | $2.30 |
| BPAX | Bot 9/6/2011 | 6000 | | $2.51 |
| BPAX | Bot 9/6/2011 | 2500 | | $2.52 |
| BPAX | Bot 9/22/2011 | 1500 | | $2.46 |
| BPAX | Sold 12/30/2011 | 10000 | | $0.49650 |

     4.    Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary, and Plaintiff is willing to serve as a lead plaintiff, a lead plaintiff being a representative party who acts on behalf of other class members in directing the action.

     5.    Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws within the past three years, unless otherwise stated in the space below: _____

_____

     6.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

     7.    Plaintiff represents and warrants that he is fully authorized to enter into and execute this certification.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _3rd_ day of February, 2012.

_____
THOMAS LAURIA